CLINTON *v*. SPENCER.

SMITH *v*. SAME.

1. DRAINS—ACT PROVIDING FOR DRAINS NO AUTHORITY FOR CONSTRUCTING SEWER.

Act No. 316, Pub. Acts 1923, as amended, providing for construction of drains, affords no authority for building an underground city sewer by county drain commissioner; terms "drain" and "sewer" not being synonymous.

2. SAME—SEWER MAY NOT BE CONSTRUCTED UNDER NAME OF DRAIN.

A large, expensive underground sewer, 13 miles long and costing $2,500,000, entirely independent of any other drainage project, is a sewer, construction of which is unwarranted under Act No. 316, Pub. Acts 1923, as amended, providing for construction of drains; and it is immaterial that in proceedings relating thereto it was sometimes termed a "sewer drain."

3. SAME—DRAIN MAY NOT SERVE AS SEWER.

While a sewer may serve the purpose of a drain, a drain may not serve as a sewer except as is expressly provided for in the law.

4. SAME—CHANGE FROM ONE TO FOUR DISTRICTS FATAL DEFECT.

Where original application to county drain commissioner was for sewer about five miles long, change by commissioner to provide for four separate and distinct sewers, some 13 miles in length, none of which followed route described in application, without creating separate and distinct district for each and requiring requisite number of signatures of freeholders therefor in each district, was fatal defect.

5. SAME—EQUITY WILL INTERFERE WHERE IRREGULARITIES WORK HARDSHIP.

While court does not pass upon necessity of project for public improvement, such as sewer or drain, yet where gross irregularities appear, resulting in hardship and invasion of legal rights, constituting constructive fraud, equity will interfere if parties act promptly.

6. Same—Necessity of Certain Owners for Sewer No Reason
   for Forcing Sewer on Others.

   That subdividers and other owners of lands might have been
     in need of new drain or sewer to take care of needs of houses
     to be built in subdivision, is no reason why other owners
     should be compelled to have drain or sewer which they did not
     need forced on them in front of their property contrary to law.

7. Same—Property Owners Acting Promptly Not Precluded
   from Attacking Irregular Proceedings.

   Property owners who were given no notice of proceedings to con-
     struct sewer 13 miles long and to cost $2,500,000, who acted
     without delay when they learned of the proposition, are not
     bound thereby and are not precluded from legally attacking the
     entire proceedings, although in the meantime contracts were
     let and large sums of money spent thereon.

8. Same—Where Irregularities Beyond Correction by Certiorari
   Collection of Tax Enjoined.

   Where irregularities in proceedings to construct a sewer by county
     drain commissioner under Act No. 316, Pub. Acts 1923, as
     amended, resulted in levying a tax on farm land greater than
     assessed valuation thereof, and are such that they rendered
     proceedings void from their inception, so that they cannot be
     corrected by certiorari, court will declare entire proceedings
     void and permanently enjoin collection of tax arising there-
     from.

Error to Oakland; Covert (Frank L.), J. Sub-
mitted January 9, 1930. (Docket No. 62, Calendar
No. 34,648.) Decided March 7, 1930.

Separate bills by Theresa C. Clinton and others
and Anselm J. Smith and others against A. W.
Spencer and others to enjoin collection of drain as-
sessment on their respective properties. The suits
were combined and heard as one. From a decree for
plaintiffs, but permitting reassessment, plaintiffs
appeal. Reversed, and assessment permanently en-
joined.

*P. H. O'Brien* (*Henry C. L. Forler* and *G. Frances Clinton,* of counsel), for plaintiffs Clinton and others.

*Henry C. L. Forler* (*Patrick H. O'Brien* and *Charles C. Stewart,* of counsel), for plaintiffs Smith and others.

*James H. Lynch* (*John C. Spaulding,* of counsel), for defendant Spencer and others.

*Monaghan, Crowley, Reilley & Kellogg,* for defendant Healy and another.

BUTZEL, J. Anselm J. Smith *et al.*, plaintiffs in one suit, and Theresa C. Clinton *et al.*, plaintiffs in another, brought separate actions against A. W. Spencer, county drain commissioner of Oakland county, Floyd H. Losee, Oakland county treasurer, John E. Ferguson, township treasurer of Southfield township, and also against S. A. Healy and R. D. Baker Company, both of Detroit, Michigan, the two contractors for building a sewer on the Eight Mile road in front of plaintiffs' respective properties. The two suits were combined and heard as one. The questions presented and the relief prayed for in each one of them are the same.

Smith *et al.* are the owners of an 80-acre farm at the northeast corner of Southfield road and the Eight Mile road, in Oakland county, Michigan. Immediately east of their property is a narrow tract of 40 acres bordering approximately 660 feet on the Eight Mile road, belonging to parties not plaintiffs in either suit. Immediately east of said 40 acres are 120 acres fronting on the Eight Mile road, belonging to plaintiffs Clinton *et al.* The frontage of the property of the two sets of plaintiffs, together with the 660 feet belonging to the 40-acre tract be-

tween their properties, is one mile in length. According to the map, the Eight Mile road in front of all of this property and for some distance east and west thereof is unpaved. The Eight Mile road is the division line between Oakland and Wayne counties. The south side of the road is the northerly boundary line of the city of Detroit. The Eight Mile road in this particular vicinity and for a considerable distance east and west thereof is unimproved, and consists mainly of farms. Some of them have been subdivided, but not otherwise improved. The Smith property is well drained by the already existing Muldruff and Hubbard drains. The property is assessed at $500 an acre, or $40,000. Admittedly, it is worth much more on account of its proximity to the city of Detroit. Plaintiffs stated that they would not take $3,000 an acre for it, but that they would consider $5,000 an acre. They testified that they had paid taxes for the drains on their lands.

Members of the Clinton family have resided on the 120-acre farm continuously since the year 1880 up to the time of the hearing of the case. Three different branches of the Hubbard drain, a regularly established drain, take care of all of the surface water on their farm. The property is farm land, but for the past two years has been used for the pasturage of cattle and horses. There are one house, two barns, and a pump house on the property. Neither the Smith nor the Clinton farms have been subdivided. There is one house on the property between the two farms. The property north of the lands in question is not built up to the Nine Mile road, except for two old farm houses on the farms. Although the assessed valuation of the Clinton property is not given, it was less favorably situated than the Smith property, which is assessed at $500 an

acre.   The Clinton farm, therefore, would not have
an assessed valuation of over $60,000 or thereabouts.
It is also admittedly worth more.   The testimony
shows that the Clinton family had some difficulty
over the title, and in order not to be bothered by real
estate men during the period while they were trying
to straighten out the title, they placed a valuation of
$8,000 an acre on the property.   Some of the front-
age on the south side of the road has been sub-
divided, but not improved.   The record further
shows that the entire frontage of the Eight Mile road
along which the sewer or drain in question is being
built consists of unimproved property, with the ex-
ception of a small number of farm houses which are
a considerable distance apart.

The Southfield road running north and south, and
beginning at the Seven Mile road, is one of the main
thoroughfares to Birmingham, Michigan.   The roads
parallel and crossing the Southfield road are one
mile apart.   Besides the Eight Mile road, which is
one mile north of the Seven Mile road, there are
upper roads known as Nine, Ten, and Eleven Mile
roads, referred to in this opinion as the upper roads.
There has been considerable real estate speculation
along the Southfield road and on the upper roads.
A number of subdivisions were laid out, but prin-
cipally on the upper roads, some of which have been
paved and improved.   A number of houses have been
built on or near the upper roads, but most of them
are far apart, and, compared with the size of the
area, they are few in number.   The property in the
city of Detroit, bordering on the Eight Mile road and
for a considerable distance south of it, is also unim-
proved, and appears to be farm property.   Some of
it has been subdivided, but none of it has been im-
proved so as to give it the appearance of more than a

farming district. The property along the Eight Mile road is an old established farming district, and apparently has been adequately drained for farm purposes by existing drains. The testimony shows that many of the subdividers on the upper roads have been anxious for a draining system that would accomplish the purpose of a city sewer, and that they were the ones who were largely instrumental in instituting proceedings for the building of a sewer under the drain law of 1923 (Act No. 316, Pub. Acts 1923), as amended.

On or about the 3d day of August, 1926, an application was made to defendant A. W. Spencer, Oakland county drain commissioner, to lay out a drainage district for a drain described as follows:

"Commencing approximately at the Ten and a Half Mile road and running south in Southfield road to approximately the Eight Mile road, thence westerly along the Eight Mile road to the River Rouge; the purpose being to afford a *sewer* of suitable kind to serve that portion of sections 24, 25 and 36 on the east of Southfield road as cannot be served by any other presently established sewer, and also to serve as wide an area on the west side of Southfield road and north of the Eight Mile road as may be possible to accomplish. Together with such subtrunks and laterals as may be deemed necessary, which said application was signed by ten freeholders, one-half of whom will be liable for an assessment on said drain."

Thereafter, on the 14th day of July, 1927, the commissioner issued an order for laying out and designating a drainage district. The preamble to this order sets out the description of the *sewer* as given in the application. The order determined that the drain should be known as the "Southfield Storm

Sewer Drain," but instead of following the five miles of route as set forth in the application, it describes four independent drains or sewers, which, together with a three-mile addition thereafter made, aggregated over 13 miles in length. The route described in the application was almost wholly disregarded. The four drains are independent of one another. They each run separately and independently along the Eight, Nine, Ten, and Eleven Mile roads, and each at its western terminal empties into the River Rouge. They are in no manner connected. There is no trunk line running through them. The building of one of them in no way affects another. It is claimed by the commissioner that he found the route described in the original application uneconomical and impractical, while the building of four independent drains or sewers would in the long run be economical. In the last analysis, however, a drain covering the distance described in the application would have cost a comparatively small sum of money. The building of the four sewers was to cost in the neighborhood of $2,500,000.

The law provides that the commissioner, in his order, shall state the width and depth of the drain, yards of earth necessary to be removed, and the estimated cost of construction (section 4, chap. 3, Act No. 316, Pub. Acts 1923). This the commissioner absolutely failed to do. Nor did the surveyor make such record in his minutes as is also required.

The law specifically states that in the order establishing the drainage district the commissioner shall give the several tracts and parcels of land, etc., that are to be benefited by the construction of such proposed drain and would be liable to assessment therefor (sections 2 and 4, chap. 3, Act No. 316, Pub. Acts 1923). The commissioner in his order,

however, did not give the particular tracts, but, in instances, described the property by quarter-sections, although it was made up of tracts belonging to various individuals. It was also traversed by highways which he did not describe, notwithstanding that the law so provides.

Following the order for establishing a drainage district, a petition was filed with the commissioner for locating, establishing, and constructing a drain. This petition contained, in accordance with the law, the names of all the freeholders whose property was to be traversed by the proposed drain and was signed by the requisite number. The names of all of the plaintiffs are given as owners. They, however, owned only two tracts of the property. If we treat the two groups of plaintiffs as only two freeholders, there would be, according to the petition, but a small number whose property would be traversed by a drain over 13 miles in length, or an average of considerably over 1,000 feet of frontage belonging to each freeholder. This shows how sparsely the entire neighborhood was settled.

The commissioner petitioned the probate court for the appointment of seven members of the board of supervisors, in accordance with the statute, to determine the necessity for the drain. They duly met in accordance with a notice published in the "Royal Oak Tribune" and the "Birmingham Eccentric," and determined that the proposed drain was necessary. Subsequently petition was made to the probate court for three special commissioners to meet with the drain commissioner at the probate court to determine the necessity of the drain in regard to the land traversed by it and not released, and the compensation therefor. Although the statute clearly provides that citation in these condemnation pro-

ceedings shall issue out of the probate court, and service be made upon resident owners personally, and upon nonresident owners by mail, in addition to notice by publication (sections 5, 6, 7, and 8, chap. 4, Act No. 316, Pub. Acts 1923), no such service was made upon plaintiffs, although some of them lived upon the premises or near by.

The damages for the right-of-way over plaintiffs' property were assessed in the sum of six cents. The commissioner's final order of determination was duly filed, and after notice was published, a meeting was held on the 28th day of May, 1928, when assessments for benefits were levied. The assessment against the Clinton property was fixed at $62,847.88, and that against the Smith property was fixed at $55,258.48.

The work was let out under two contracts: that for the Eight Mile road and Eleven Mile road sewer for $1,150,000, to defendant Healy, and that for the Nine and Ten Mile roads sewer, amounting to $1,275,000, to defendant R. D. Baker Company. Bonds were issued in the sum of $2,730,000. It is not necessary to give these proceedings in further detail. It is sufficient to state that the evidence shows, and the circuit judge found, that neither plaintiffs Smith nor plaintiffs Clinton received any notice whatsoever of these proceedings. They first learned of the building of the sewer or drain when the contractors came upon their land. They thereupon protested at once and the "drain" was diverted from plaintiffs' land to the highway. Inasmuch as plaintiffs did not receive any notice of the proceedings whatsoever, they had no opportunity to oppose or contest them. When they did learn of them, they instituted this action in equity to enjoin the collection of the assessment against their prop-

erties and to restrain the further construction of the drain; to remove any cloud created upon their title; to declare the bonds void, and for other relief. The judge held that the plaintiffs did not receive the legal notice; but since the drain was moved to the highway, they were not damaged, because none of their property was taken; that new proceedings might be taken to assess them in accordance with the law; and that if they were dissatisfied, they would have the right to bring certiorari proceedings in accordance with the statute. The plaintiffs have appealed from this decision, claiming that the proceedings were so fatally defective that new proceedings based on the original application, order, etc., could not be brought against them and that as far as they were concerned, all of the proceedings were a nullity. The sole question in the case is whether, as far as these plaintiffs are concerned, they have a right to a permanent injunction restraining any assessments against their property because of the building of this sewer or drain. They claim that there is no warrant of law permitting the building of such a sewer, and, moreover, if there is, the entire proceedings are otherwise fatally defective as far as they are concerned.

The first question that confronts us is whether the drain law of 1923 (Act No. 316, Pub. Acts 1923), as amended in 1925 and 1927, affords any authority for building an underground sewer. The original application filed was for the purpose of affording "a *sewer*," not a drain. Irrespective of the terminology used, the structure that was contracted for and was being built was a city sewer. An effort was made at the hearing of the case to use the words "sewer" and "drain" interchangeably, and the claim is made that a sewer and a drain are both the same. A reference to the various exhibits shows

that there was only one purpose in the mind of the drain commissioner, and that was to construct a covered or tunneled sewer to be built largely of reinforced concrete pipe. The notice of the letting of the drain contract provided for vitrified pipe sewer, reinforced concrete sewer pipe, manholes as wide as 72 inches in diameter, junction chambers, basin connections, and sewer pipe as wide as 9.5 feet in diameter. The word "sewer" is used constantly in the record and the exhibits, although frequently the word "drain" is used in its place, and sometimes the structure is referred to by the name given it by the commissioner, viz., "sewer drain." The sewer in front of the Clinton property was to be from 25.5 feet to 31 feet in depth. The crock was from 7 feet to 7.5 feet in diameter. The sewer in front of the Smith property was to be from 33.5 feet to 35.2 feet in depth and the crock was to be 7.5 feet in diameter. There was no question but that it was to be a sewer which would accomplish both the purpose of a drain and a city sewer. The statute, however, provides only for drains, and not for city sewers.

While there is some authority in other jurisdictions to the effect that a sewer and a drain are synonymous, the legislature of this State has not recognized them to be the same. The drain law of 1923, as amended in 1925 and 1927, provides for ditches, sometimes covered over inclosed drain pipe, for the purpose of carrying away surface waters from farms. Other laws provide for sewers for cities and villages. A careful reading of the 1923 drain law, as amended, when this project was undertaken, shows that a city sewer was not contemplated thereunder. The very fact that the commissioner was obliged in his order to state the amount of earth that was to be removed is persuasive of this fact.

There is a provision in the law for the connection of city and village sewers to the drain. Defendants contend in this case that there are three kinds of property; farm lands, acreage, and city and village property; also, that this particular kind of drain was necessary for acreage. The law makes no such distinction, and while undoubtedly the building of a small conduit or sewer as incidental to a drainage project might be necessary and proper, the construction of a large, expensive underground sewer entirely independent of any other project is unwarranted. It is claimed that it would be uneconomical to build a drain in this district that would not be capable of removing within a very short time after a storm all surface water, and at the same time disposing of feculent matter. This is the purpose of a city sewer. Were defendants attempting to build anything else than a city sewer at this enormous expense they would be guilty of the most wasteful extravagance. But this fact does not authorize them to do something for which the law makes no provision. The building of drains is not costly, and imposes no great hardship on farming communities. The legislature has provided a *quasi*-judicial proceeding under which drains are built and all questions relating thereto are settled. This was done so as to provide adequate drainage for farm lands in an inexpensive manner. This court has always insisted that the law be strictly followed. The fact that we have frequently been willing to overlook slight irregularities in drain proceedings is used by defendants as the excuse for gross irregularities, which the record shows took place in many instances. We, however, find no authority whatsoever for the building of a city sewer under the drain law, and we believe that there is a distinction between a drain

and a sewer. There was no provision for a sewer in the law under which these proceedings have been taken. The law of 1923, as amended in 1925 (Act No. 365, Pub. Acts 1925), provides as follows (chapter 1):

"SEC. 2. The word 'drain' whenever used in this act shall be deemed to include any watercourse or ditch, opened or proposed to be opened, and improved for the purpose of drainage, and any artificial ditch or drain, levee, dyke or barrier, or tile drain proposed or constructed for such purpose."

Section 6 of chapter 17 provides as follows:

"Any landowner in the drainage district may petition the commissioner for permission to construct a blind drain, by the use of drain tile or sewer pipe, to any regularly established drain, and said permission shall be granted by the commissioner when in his opinion the nature of the ground to be crossed will admit thereof and the surface of the land can be restored and for such purpose said blind drain may traverse the lands of other freeholders in the district: *Provided,* That before such permission be granted by said commissioner the consent in writing of the owner or owners of the lands to be traversed by said proposed blind drain be obtained: *Provided further,* that the entire expense thereof shall be borne by such petitioner."

It has been held that the word "drainage," when used in a city, includes sewerage, and that a drain might be built in an incorporated town which had the power to construct sewers. *City of Valparaiso* v. *Parker,* 148 Ind. 379 (47 N. E. 330). That a drain act was sufficient to permit the drainage of land in an incorporated town although the town had power to construct sewers was determined in *Ald-*

*rich* v. *Paine,* 106 Iowa, 461 (76 N. W. 812). In *City of Charleston* v. *Johnston,* 170 Ill. 336 (48 N. E. 985), it was held that the word "drain" is broad enough to include sewers, where an ordinance was passed by a city to build a sewer under the drain law.

We do not believe, however, that the drain law in Michigan, under which the defendants were acting, is sufficiently broad to include sewers. In *Clay* v. *City of Grand Rapids,* 60 Mich. 451, this court held that sewage included all kinds of drainage and water discharge, as well as the escape of filthy water. We do not believe that the converse is true. We believe that a sewer may serve the purpose of a drain but a drain may not serve as a sewer except as is expressly provided for in the law. In the case of *Roebling* v. *City of Cincinnati,* 102 Ohio St. 460 (132 N. E. 60), the court said:

"It is contended by the city that the word 'drain,' as used in the proceedings, is broad enough in construction to include a sanitary sewer. With this view we cannot agree, although realizing full well that in common, ordinary usage the two words 'drain' and 'sewer' have to some extent been treated as synonymous and interchangeable. Applied, however, to public city improvements in the streets, we believe that the two terms have come to have their own distinctive meanings, and are easily distinguishable one from the other.

"A drain is an incident to street building. No engineer would think of constructing a street without providing for the drainage of that street. It is an essential element of good workmanship and substantial construction, and it is highly important that drains be provided to prevent the accumulation of water upon the surface of the street and adjacent territory, for the purpose of preventing early decay and deterioration of the street. By reason of its

construction a street may receive surface water, and frequently does, from territory outside of its own compass, from the terraces of abutting property and from the roofs of houses thereon.

"The word 'sewer,' on the other hand, when applied to city improvements, means a large, underground passage for fluid and feculent matter—the refuse and filth necessarily present in populated centers—by means of which this matter is carried off. A sewer is employed for the convenience of the people, and its prime purpose is for the benefit of the health of the public.

"An important and expensive improvement, such as a sanitary sewer, certainly cannot be provided for without invoking power so to do in the manner provided by law, and it will not do to claim that right, or attempt to invoke that power, through the guise or deceit of an improper name."

In *Warren* v. *City of Grand Haven,* 30 Mich. 24, Mr. Justice COOLEY said (at page 28):

"The argument on this branch of the case assumes that those provisions of the charter which, for sanitary reasons, confer authority upon the council to cause ditches to be opened, and swamps, marshes and other low lands to be drained, are applicable to the case. But the provisions in the charter for the draining of the natural surface have nothing to do with the case of sewers. Sewers are required for a different purpose altogether, and are usually constructed with little regard to the natural condition of the land, and for the purpose of carrying off, not the natural fall of water, so much as the offensive material the accumulation of which is a necessary result of a dense population, and which, if not removed, would be a cause of discomfort and disease."

The entire proceedings in this case are based upon the original application for a sewer about five miles

in length. This was changed by the commissioner to provide for four separate and distinct sewers totaling some 13 miles in length. The Eight Mile road sewer in front of plaintiffs' property had no connection with the Nine, Ten, or Eleven Mile road sewers. As already pointed out, they are entirely different projects, for each of which a separate drainage district should have been created. The need of drains or sewers for the upper roads had no relation to the necessities of the Eight Mile road district. In determining the necessity of a drain, the owners of the property on the Eight Mile road should have been treated independently of the others, just as the testimony would indicate they were treated in levying the assessments. There may have been a great need of new drains or sewers on the upper roads. As far as these plaintiffs are concerned there was no need of them on the Eight Mile road, nor does the record indicate that the other owners of property along the Eight Mile road required a new drain or sewer. Had a separate drainage district been established for the Eight Mile road in accordance with the law, it is doubtful whether the requisite number of signatures of freeholders could have been secured to a petition to locate, establish and construct a drain. It is claimed that this drain or sewer would be of great benefit to owners of the property in years to come. This would not benefit the present owners of land, who before that time might lose their property on account of their inability to pay the enormous taxes assessed against their property to pay the cost of such an improvement. They might argue, as it was at the hearing in this court, that all of the property bordering on the Eight Mile road was across the street from, and contiguous to, the city of Detroit, which had adequate sewers; that it might be but a short time before the

property would be annexed to the city of Detroit, in which event the sewers of Detroit could be used by plaintiffs at a minimum expense, and not at a cost far exceeding the total assessed valuation of their property.

Plaintiffs showed that their lands are well drained of surface water, and that it would be many years before a city sewer as contemplated would benefit them. Parties who may not believe that their particular property will be benefited cannot prevent public improvements in the neighborhood or district in which their property is located, provided all proper, legal steps have been taken in all proceedings in connection with such improvements. This, however, is not the present situation. The record shows that as far as plaintiffs are concerned there was no necessity for new drains, or even a sewer, at this time. It further shows that the entire Eight Mile road district not only did not need a sewer but might not for years to come. Had plaintiffs received timely notice they might have been able to stop the undertaking before work had been begun. The cost of building the sewer would amount to many hundreds of thousands of dollars, and the payment of interest on this expenditure for a large number of years during which such improvement would be practically useless amounts to sheer waste and extravagance. We do not pass upon the necessity of public projects when legally carried out. When, however, there are so many gross irregularities, resulting in hardship and an invasion of the legal rights of plaintiffs, we believe it constitutes a constructive fraud, and equity will interfere where parties act promptly. This plaintiffs did. *Hinkley* v. *Bishopp,* 152 Mich. 256; *Michigan Central R. Co.* v. *Baikie,* 249 Mich. 138; *Cook* v. *Covert,* 71 Mich. 249; *Frost* v. *Leatherman,* 55 Mich. 33.

The fact that the subdividers and other owners of lands abutting on or near the upper roads might have been in need of a new drain or sewer, to take care of the needs of houses to be built on the lots in the subdivisions, is no reason why plaintiffs should be compelled to have a drain or sewer forced upon them in front of their property contrary to law. Particularly is this true when there was no desire on their part to have a sewer built which would force them to pay assessments in excess of the total assessed valuation of their properties. Even if such assessments were paid in installments, as is provided for, it would force the owners of the property to pay each year an amount which they could not in any event realize from their farms. It might be said that the · property was not adequately valued for assessment purposes. This undoubtedly was true. But it may also be true, as was claimed, that during real estate booms property may be valued at very high prices which may not be obtained when the boom subsides. An assessment of this size would in all probability compel parties to give up their farms, and sell them at a time when an inadequate price would be obtained. The effect of the proceedings in the case is to levy an assessment of $62,847.88 against property assessed at not more than $60,000, and a tax of $55,258.48 against property that is assessed at $40,000. Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. (U. S.) 316, stated that "the power to tax involves the power to destroy." This is largely· true in the present instance.

In the case of *Myles Salt Co.* v. *Board of Commissioners of Iberia & St. Mary Drainage Dist.,* 239 U. S. 478 (36 Sup. Ct. 204, L. R. A. 1918 E, 190), involving an assessment for drainage purposes, the court held as follows:

"It is to be remembered that a drainage district has the special purpose of the improvement of particular property and when it is so formed to include property which is not and cannot be benefited directly or indirectly, including it only that it may pay for the benefit to other property, there is an abuse of power and an act of confiscation. *Wagner* v. *Baltimore,* 239 U. S. 207 (36 Sup. Ct. 66). We are not dealing with motives alone but as well with their resultant action; we are not dealing with disputable grounds of discretion or disputable degrees of benefit, but with an exercise of power determined by considerations not of the improvement of plaintiff's property but solely of the improvement of the property of others—power, therefore, arbitrarily exerted, imposing a burden without a compensating advantage of any kind."

In *Kinnie* v. *Bare,* 68 Mich. 625, 629, Mr. Justice CHAMPLIN stated that:

"Drain laws which take from the citizen his private property against his will, can be upheld solely upon the ground that such drains are necessary for the public health. They proceed upon the basis that low, wet, and marshy lands generate malaria, causing sickness and danger to the health and life of the people; that when they are of such character as to injure the health of the community, they become and are public nuisances, which ought to be abated, and the legislature have the right, under the police power inherent in every government, to protect the people from plague and pestilence, and to preserve the public health. But drainage for the purpose of private advantage, such as improving the quality of the land, or rendering it more productive or fit for cultivation, cannot be justified under the police power. Neither public convenience nor public welfare, independent of considerations of the public health, will justify the legislature in the en-

actment of laws 'for the construction and maintenance of drains, and the assessment of taxes therefor.' "

There is no evidence in this case that the lands to be drained by the Southfield storm sewer drain were in such a condition as to be detrimental to public health.

While it is true that it may have been commendable on the part of the commissioner to have concluded not to have a five-mile sewer in accordance with the original application, when he abandoned this project, it was at an end. He had no right to build four independent sewers.

Counsel for defendants urge as indicative of the power of the drain commissioner to build the four independent sewers under the application for the original single drain the cases of *Arnham* v. *Round,* 210 Mich. 531, and *Patterson* v. *Mead,* 148 Mich. 659. In the former, the court states (page 536):

"'By the filing of a valid application for the Brush creek drain the commissioners acquired jurisdiction. The extending the line of the drain upwards of three miles beyond the route described in the application did not make the drain proceedings void. The most that could be claimed for it is that it was an irregularity.''

An examination of the racts in this case, as disclosed by the opinion and record, indicates that the extension, which was purported to be made under the application for a new drain, followed for the most part the route of an old drain, application for the widening and deepening of which had been made at the time of application for the establishment of the new drain. The beginning of the new drain and the terminus of the old were at practically

the same point. The entire drain when completed formed a continuous system. The new drain, running as it did along a natural watercourse, formed the natural outlet for the old drain. The situation is decidedly different from four independent drains, affecting four different districts, with four separate outlets.

In *Patterson* v. *Mead, supra,* the court said (page 664):

"There is no objection to a single proceeding by the county drain commissioner to open, widen, straighten, deepen, and extend, three drains, established by township drain commissioners, where it appears, as it does here, that they, in fact, constitute one drainage canal, no portion of which can be much disturbed without affecting the entire drain."

It appears from the record of this case that each of these drains had been established at different times in the past and that each had been established by township drain commissioners, but that as they now existed they formed one single continuous drain. Furthermore, the single petition to the county drain commissioner enumerated each drain, and requested the deepening of all three, stating that they in reality formed only one continuous drain, and, in general, treated them as one drain. The grounds for regarding them as three drains would seem to have existed only in the fact that the three portions bore different names and that they had been established at different times and by different drain commissioners.

Plaintiffs acted without delay immediately upon their learning of the proposed sewer, and they are not, therefore, precluded from legally attacking the entire proceedings. Counsel for defendants have termed the building of four independent sewers a

"slight irregularity," but we do not deem it so; nor do we regard the changes as insignificant deviations from the original plan. Were these irregularities such as might be corrected on certiorari, we would relegate plaintiffs to that remedy. We do not believe, however, that they can be so corrected. For they affect the entire proceedings from their inception. Plaintiffs should have had the opportunity to oppose the proceedings at the very beginning.

We are not unmindful of other factors that enter into the consideration of this case, but plaintiffs are in no way accountable for them. They are entitled to the equitable relief prayed for.

Other irregularities have been called to our attention, but they need not be discussed, inasmuch as plaintiffs are being given relief for the reasons hereinbefore stated.

Inasmuch as plaintiffs never received any notice of these proceedings and are, therefore, not bound by them, it is decreed that the entire proceedings are void as against them and their properties; and any tax liens that may have been placed against plaintiffs' properties on account of the so-called "Southfield storm sewer drain" are herewith declared to be null and void, and the various taxing authorities that are defendants in this case are herewith permanently enjoined from further assessing said properties for the building of a drain or sewer arising out of any of the present proceedings.

Plaintiffs will recover costs.

Wiest, C. J., and Clark, Potter, Sharpe, North, and Fead, JJ., concurred. McDonald, J., did not sit.