HANKINSON *v.* DEAKE.

1. DRAINS—SEWERS—SIZE OF DRAIN—INJUNCTION.
  In suit to enjoin collection of assessments for construction of drain, on ground that so-called drain was in fact sewer, and was larger than necessary for drainage purposes, holding of circuit judge in favor of plaintiffs *held*, not justified, under record which shows that size of said structure was justified, that it was designed and built for drainage, and that it effectively serves that purpose.

2. SAME—ASSESSMENTS FOR BENEFITS.
  Where, in assessing benefits for drain, there was no fraud, and assessing officer acted in good faith and, on theory reasonably expected to produce equality, court will not disturb his judgment, although there may have been some inequalities.

3. SAME—CERTIORARI REMEDY FOR IRREGULARITIES.
  Remedy for irregularities in drain proceedings being by certiorari, no advantage thereof may be taken in suit to enjoin collection of assessments for construction of drain.
  SHARPE, WIEST, and BUTZEL, JJ., dissenting.

Appeal from Washtenaw; Moynihan (Joseph A.), J., presiding. Submitted June 9, 1933. (Docket No. 86, Calendar No. 37,211.) Decided December 5, 1933. Rehearing denied January 30, 1934.

Bill by Oliver A. Hankinson and others against Clayton Deake, County Drain Commissioner, and others to enjoin levy of assessments for a so-called drain. Decree for plaintiffs. Defendants appeal. Reversed.

---

* Continued from Vol. 264.

*Stivers & Hooper* and *John P. Kirk,* for plaintiffs.

*Roscoe O. Bonisteel* and *Albert J. Rapp,* for defendants.

McDonald, C. J.   The purpose of this suit was to test the validity of drain proceedings.   The bill was filed by owners of land affected by the drain.   The defendant Deake was drain commissioner of Washtenaw county at the time the proceedings for the construction of the drain were instituted.   Other defendants are the present drain commissioner, the county treasurer, and the township treasurer of Ypsilanti township, where the drain is located.

In accordance with a proper petition, the county drain commissioner established a drainage district comprising about 1,100 acres of land which he designated the "Beyer Drainage District."   The drain was completed at a cost of $300,000.   The plaintiffs contend that the drain, so-called, is in fact a sewer; that the action taken by the commissioner was under the drain law which gave him no authority to construct a sewer, and therefore the whole proceedings are a nullity.   On the hearing the trial court sustained the plaintiffs' contention, and entered a decree enjoining the collection of the assessments for the cost of construction, and setting them aside as illegally imposed.   The defendants have appealed.

The sole question involved is whether the drain, so-called, is in fact and in law a drain or a sewer. If a sewer, the commissioner was without authority under the drain law to construct it, and the whole proceedings are a nullity.

It is conceded that there was a pressing need of adequate drainage of this district comprising about 1,100 acres of land.   The property owners desired it,

and the board of determination found it was a necessity. But the plaintiffs complain that it was larger than was necessary for drainage purposes, and they stress its size as evidence that it was intended to function as a sewer. It was a large structure, but it was designed to drain a large area of very wet land. The main drain was one and three-fourths miles long, an underground passage constructed of reinforced concrete tile varying in size from 48 inches to 84 inches, with numerous 12-inch laterals, manholes, etc. Considering the water conditions, the character of the soil, and the topography of the land, a covered drain of considerable depth was necessary. The size of the tile necessary depends upon the amount of water to be carried by the drain. Engineers have established methods of determining the total volume of water that would flow through the drain, and thus are able with approximate correctness to determine the size of tile necessary to carry the flow. Their conclusions in this case, honestly and intelligently arrived at, are convincing of the fact that the large tile used in the construction of the drain was necessary to adequately drain the drainage area.

As additional evidence that the drain, so-called, was constructed to function as a sewer, the plaintiffs point to the manner of joining the tile. It is their claim that the joints were cemented together in such a way as to prevent the infiltration of sub-surface water, a method used in the construction of sewers and not in the construction of drains. Whether the joints were made water tight was a disputed question of fact. There is a conflict in the testimony of witnesses who claimed to have examined them. The most dependable evidence on that question is that of Mr. Ohr, a civil engineer, who, by constructing a weir—a measuring device used by engineers—at the

outlet of the drain, was able to measure the daily flow of water in dry weather. From his testimony, it convincingly appears that the joints of the tile were sufficiently porous to allow infiltration of the sub-surface water. The necessity for employing the method used in joining the tile seems to have arisen because of the condition of the soil where the drain was laid. The record shows that there was very fine sand in the nature of quicksand and it was necessary, if the structure was to function as a drain, that the joints of the tile be sealed against the sand but not against the water. It is the contention of the defendants that the method used accomplished that result and was not designed to make and did not make water-tight sewer joints. We think the evidence sustains this contention.

Further, in support of their contention that the drain, so-called, is a sewer, the plaintiffs claimed that it is capable of functioning as such and is actually used for that purpose. There are a number of houses in the district—the record does not show how many—but part of the district has been subdivided and some buildings erected. One purpose of the drain was the drainage of the area occupied by residences with flooded basements. It is possible to convey sewage from these residences into the laterals of the drain after it has passed through septic tanks. To some extent that has been done. Householders were told by the commissioner that they could do so, but such use does not mean that the drain is used as a sewer. Feculent matter is removed by the septic tanks and the liquid therefrom is little different from the water which enters the drain from other sources. It is not filthy water, such as is carried by a sewer. Mr. Atwell, an experienced

engineer, who had charge of the construction of this drain, testified:

"Anything that receives feculent matter in general would be a sewer. Anything else which takes the surface water and takes the ground water, I believe, would be a drain. And by feculent matter, I mean raw sewage matter, direct from the toilet without passing through a septic tank. The solids at least are removed in a septic tank. There are no evidences in the effluent from this drain that there are any solids of any kind."

In their brief the plaintiffs say:

"The use of vitrified sewer pipe, reinforced concrete pipe, and manholes, and the size and method of construction, all point· to the indisputable fact that the structure was capable of use as a sewer, and, being so, falls squarely within the rule announced in *Clinton* v. *Spencer*" (250 Mich. 135).

If a drain of this size and character was necessary in the judgment of the commissioner for the adequate drainage of the district, and was designed and constructed for that purpose, it matters not that it is capable of being used as a sewer. In *Clinton* v. *Spencer, supra,* relied on by the plaintiffs as controlling of this issue, the drain was designed and constructed for the double purpose of a drain and a city sewer. In the instant case, the drain was designed and constructed for drainage purposes only. The proceedings followed by the commissioner are authorized by the drain law and are not to be invalidated because the drain constructed resembles a sewer or is capable of being used as a sewer. It was designed and built for drainage, and the record shows that it effectively serves that purpose. We think that the trial court erred in holding that it was a sewer.

The claim is made that the assessments for benefits as to some of the plaintiffs were so high as to be confiscatory. Undoubtedly there are some inequalities in the assessments. It would be strange and unusual if there were not. But where, as in this case, there is no fraud, and the assessing officer acted in good faith and on a theory reasonably expected to produce equality, the court will not disturb his judgment.

As the petition for the construction of this drain conferred jurisdiction on the commissioner, alleged irregularities in the drain proceedings cannot be taken advantage of in this case. If there were such irregularities as claimed by the plaintiffs, their remedy was by certiorari.

For the reason that the trial court erred in finding the drain in question was not in fact and in law a drain, his decree is reversed. A decree will be entered in this court in accordance with this opinion. Defendants will have costs.

POTTER, NORTH, and FEAD, JJ., concurred with Mc-DONALD, C. J.

BUTZEL, J. (dissenting). I am not in accord with the opinion of Mr. Justice McDONALD in holding that the Beyer "drain," so-called, is not in fact a sewer. The drain law (Act No. 316, Pub. Acts 1923, as amended by Act No. 365, Pub. Acts 1925, and by Act No. 331, Pub. Acts 1927) under which the alleged "drain" was built, did not permit the construction of a sewer. Clinton v. Spencer, 250 Mich. 135. The subsequent amendment (Act No. 318, Pub. Acts 1929), which enlarged the scope of the law so as to include the erection of a sewer, is not applicable. See Warren Township v. Engelbrecht, 251 Mich. 608. The question, therefore, narrows itself to whether

the structure is a drain as authorized by the then-existing law, or is a sewer.

In *Clinton* v. *Spencer, supra,* the structure was clearly a sewer and was so named in the proceedings initiated prior to its construction. In many respects it resembled the "drain" in the instant case. Both structures were very deep and large vitrified crock and reinforced concrete pipe were used in each case. In the instant case, involving the Beyer "drain," provision was made for 344 inlets and 266 manhole covers with perforated tops. Laterals were laid in a sufficient number of subdivision streets so as to make possible house connections for the entire area and "Y's" were placed on all 12-inch laterals to accommodate such connections. Many of them were adapted to the removal of water from septic tanks, as well as for the drainage of house basements. The main structure was a large underground tunnel, laid at an average depth of 13 feet. The diameter of the pipe varied from 48 inches to 84 inches and all joints were sealed with oakum and cement.

Appellants contend that all irregularities in the proceedings to build the drain and lay out the drainage district are subject to attack by certiorari only and not by the bill of complaint brought to set aside the assessment. As the trial judge based his conclusions entirely upon the finding that the structure was a sewer, we shall limit our discussion to this phase of the case. If the structure is a sewer, the drain commissioner was absolutely devoid of jurisdiction in the premises and the entire proceedings were a nullity and subject to attack by the methods employed herein. *Township of Lake* v. *Millar,* 257 Mich. 135.

In *Clinton* v. *Spencer, supra,* we called attention to the simplicity of the procedure provided by law

for the building of a drain. This is undoubtedly due to the fact that the type of structure originally contemplated by law was comparatively inexpensive and the assessments against the land correspondingly small. That portion of the statute requiring a record of the amount of earth to be removed leads to the inference that only an open ditch or simple tile drain was intended. In the present case, as in *Clinton* v. *Spencer, supra,* the total drain assessment against the subdivision lots in many instances equaled or exceeded their appraised value. These assessments may not have seriously affected single lots already improved by houses but they became a burden, almost confiscatory in character, when applied to farms and vacant lots. The purpose of the drain in part seems to have been to accommodate houses that had been built, as well as those it was contemplated would be erected within the area drained, a large proportion of which consisted of subdivisions near the city of Ypsilanti. It was believed that a very large industrial plant was about to locate in the vicinity and that this would naturally result in a large demand for houses in the many subdivisions opened. A portion of the drainage district already had adequate facilities but a very large part of it unquestionably required additional drainage, particularly so during certain portions of the year.

Appellants claim that the topography of the district demanded a large, closed drain; that there was water near the surface of the soil; that the lay of the countryside was flat, necessitating the use of extremely large "tile;" that the joints were not tightly sealed and thus permitted the infiltration of surface water along the path of the drain; that the common practice of drain contractors was to provide facilities capable of carrying the flow from the most severe storms likely to be experienced over a 10-year

period; that the use of laterals and accompanying Y's was solely to relieve cellars of water; and that the discharge of water from septic tanks, after being purified, was only incidental, and insufficient of itself to justify characterization of the structure as a sewer rather than a drain. The drain law in force at the time provided for water courses or ditches opened and improved for the purpose of drainage and also included tile drains constructed for such purposes, as well as such mechanical devices as would properly purify the flow in the drains.

We appreciate the fact that, owing to changing conditions, the conception of a drain is somewhat subject to variation, but, even making allowances for the problems of a well-populated rural district, possessed of a topography necessitating large and deep closed drains, the law under which the proceedings were had did not permit the construction of a sewer. We agree with the trial judge that the structure was a sewer.

We are impressed with the expert opinions of Mr. Ohr and Mr. Atwell, the latter the engineer who designed the structure. Their testimony is referred to by Mr. Justice McDONALD. The tests were made by Mr. Ohr at the outlet of the sewer and at one other point. He testified as to the large volume and great velocity of the flowage of water and its increase after a rain, concluding therefrom that the infiltration and carriage of ground water, one of the principal duties of a drain, was being accomplished by the structure. On the other hand, it must be remembered that there were 344 inlets as well as 266 manholes leading to the "drain" and, as was shown, there was also a constant overflow of water that found its way into the "drain" from a point on the Michigan Central Railroad tracks at which locomotives received their water supply. There is no show-

ing as to what proportion of the flowage arrived from these sources. Ohr further stated that methylene tests had proved that the water discharged at the outlet was pure and free from contamination. Two other lay witnesses produced samples taken at a considerable distance from the outlet and exhibiting all the characteristics of sewer water.

Mr. Atwell testified that the structure was designed to take care of surface and sub-surface water without any allowance for sewage, but that it was nevertheless capable of carrying sewage. He justified this statement by asserting that the amount of sewage matter likely to enter such a structure would be extremely small in comparison with the amount of water it was designed to receive. A few witnesses testified that they saw feculent matter passing through the "drain" and that very obnoxious odors emanated from certain portions of it.

There is much conflicting testimony as to whether the joints were tightly sealed or not. In drains, as a rule, the joints are either left open or very loosely sealed in order to permit the infiltration of ground water. Storm and sanitary sewers are generally tightly sealed so as to permit the entrance of solids and water only through designated inlets. Appellants claim that water could seep through joints filled with oakum and cement, while appellees show that, if proper use is made of these materials, it is impossible for any considerable amount of water to penetrate. The appellants allege that, at the beginning of building operations, it was not believed necessary to seal the joints, but that the infiltration of fine sand made some sort of loose sealing necessary.

It would not be of much avail to discuss all of the conflicting testimony contained in the two-volume record. We are impressed with the corroborated

testimony of witness George Jerome, formerly city engineer for the city of Detroit, and a man of vast experience. Jerome examined the drain and concluded that the joints were well sealed, allowing very little seepage. He went down eight different manholes, traveled some distance through the larger crocks and examined the manholes, which are of the same type as are found in city sewers. He reported noxious odors emanating from the smaller crocks and the presence of some feculent matter. In his opinion, the structure is a combined storm and sanitary sewer. The trial judge, who heard the witnesses testify, came to a conclusion amply supported by the record.

The decree of the lower court should be affirmed, with costs to plaintiffs.

SHARPE and WIEST, JJ., concurred with BUTZEL, J. CLARK, J., took no part in this decision.