DETROIT TRUST CO. v. DINGMAN.

1. DRAINS—NECESSITY—COUNTY DRAIN COMMISSIONER—SEWERS.
   If a drain of a certain size and character was necessary in the judgment of the county drain commissioner for the adequate drainage of the district and was designed and constructed for that purpose, it matters not that it is capable of being used as a sewer (Act No. 316, Pub. Acts 1923, as amended by Act No. 365, Pub. Acts 1925).

2. SAME—CONSTRUCTION—SOIL—TOPOGRAPHY.
   Drain constructed under general drain law pursuant to petition filed in December, 1927, which had an assessment district consisting of 217 acres, largely platted, was nine-tenths of a mile long, was below surface from 14 feet at upper end to 22 feet at outlet into diversion chamber and septic tank near river, of monolithic concrete and two-ring brick and segmental block section construction, with numerous connecting laterals, provision for connections in front of respective properties, 13 catch basins and three special inlets into which the flowage of three ditches is received, built in heavy yellow clay underlain by blue clay in a rolling area largely wooded, held, a drain, the construction of which by the county drain commissioner was permitted by then existing statutory provisions, where evidence shows existence of a public sense of need for drainage, duly instituted proceedings therefor, and expenditure of public moneys thereon (Act No. 316, Pub. Acts 1923, as amended by Act No. 365, Pub. Acts 1925).

3. SAME—SPECIAL DRAINAGE FOR STREETS.
   Since development of land for residential purposes necessitates streets of an improved character that cannot be preserved except as special drainage is provided to care for surface water, which drainage is not infrequently cared for by drains with closed joints and laid deep in the ground, the fact that such drains are so built and used also for a sewer does not deprive the structure of its character as a drain. (Act No. 316, Pub. Acts 1923, as amended by Act No. 365, Pub. Acts 1925).

4. SAME—SEWERS—QUESTION AS TO NATURE OF CONSTRUCTION—
EQUITY.

If the question as to whether a structure is a drain or a sewer
is a close one and the determination that it was the latter would
relieve plaintiffs of special assessments therefor, a court of
equity would not be prone to adopt such latter construction,
where those who petitioned for it got exactly the improvement
they sought, are continuing to use it, and their property values
are obviously enhanced thereby (Act No. 316, Pub. Acts 1923,
as amended by Act No. 365, Pub. Acts 1925).

5. SAME—INJUNCTION—SPECIAL ASSESSMENTS—INCIDENTAL USE OF
DRAIN AS SEWER.

In suit by property owners to enjoin assessment and collection
of special assessments for the construction of a drain and to
compel repayment of taxes and assessments theretofore paid
by them, plaintiffs were not entitled to relief under record
showing that at inception the structure was contemplated as a
drain, that there was real need for drainage in the district,
that the structure effectively provided the needed drainage,
that there was authority for the construction of such a drain
by the county drain commissioner notwithstanding that it was
also contemplated it would be used incidentally in carrying off
sanitary sewerage (Act No. 316, Pub. Acts 1923, as amended
by Act No. 365, Pub. Acts 1925).

Appeal from Wayne; Ferguson (Homer), J. Submitted June 14, 1939. (Docket No. 76, Calendar No. 40,600.) Decided December 19, 1939.

Bill by Detroit Trust Company, a Michigan corporation, trustee, and others against George Dingman, Wayne County Drain Commissioner, and others to restrain the collection of taxes, to compel repayment of taxes, and for other relief. Decree for plaintiffs. Defendants appeal. Reversed.

*Edward J. O'Donnell, Robert J. Hanley,* and *John G. Dunn,* for plaintiffs.

*Duncan C. McCrea,* Prosecuting Attorney, *Garfield A. Nichols* and *William L. Brunner,* Assistants Prosecuting Attorney, for defendants.

North, J. In this case plaintiffs seek injunctive relief by way of restraining defendants from assessing and collecting taxes imposed on plaintiffs' properties for the construction of a drain in the township of Grosse Ile, Wayne county, Michigan; and also to compel repayment to plaintiffs of taxes and assessments heretofore paid by them for the construction of the drain. Decision turns on whether these drain assessments were imposed upon plaintiffs' properties without warrant of law. After a hearing on the merits the circuit judge entered a decree restraining the future collection or reassessment of these drain taxes. This result was reached on the theory that the structure was not a drain, but instead it was a sanitary sewer which the drain commissioner had no jurisdiction to build. Defendants have appealed.

The controlling question is whether the construction involved in this case was in good faith laid out and built as a drain or whether in fact it was conceived and constructed a sanitary sewer. This structure is known as Grosse Ile tile drain No. 4 and is located on the island of Grosse Ile situated in the Detroit river. The island is approximately 7½ miles long and 1½ miles wide. The assessment district consists of 217 acres. A large portion of the area is platted. The drain lies along Bellevue avenue, a distance of approximately nine-tenths of a mile exclusive of a 12-inch lateral at the upper end which extends to the property of the Grosse Ile Golf and Country Club. At its easterly end it empties into a diversion chamber and septic tank located near the east end of Bellevue avenue and practically adjacent to the Detroit river. From this point and extending in a westerly direction for a distance of 2,094 feet the construction is of monolithic concrete; but as the drain extends westerly the barrel is decreased in

size from 33 inches to 12 inches, the portion of larger
capacity being constructed of two-ring brick and
segmental block sections. The main portion of the
drain is below the surface of the street at depths
varying from about 22 feet at the outlet to approxi-
mately 14 feet at the point from which the lateral
extends to the Grosse Ile Golf and Country Club
property. There are numerous connecting laterals,
and provision is made for connections in front of the
respective properties along which this construction
extends. There are 13 catch basins located along
Bellevue avenue and three special inlets into which
the flowage of three ditches is received. For the most
part the soil drained is a heavy yellow clay under
which there is a stratum of blue clay. "The topog-
raphy is not rugged but rolling and covers an area
that is largely wooded."

While it appears from the record that the lay of
the land in the locality of this drainage district af-
forded somewhat of a natural drainage, still there is
in this record persuasive testimony of facts and cir-
cumstances indicating the need of construction for
drainage. The proceedings which led to the consum-
mation of this structure were started by an applica-
tion for laying out and designating a drainage dis-
trict in December, 1927. That there was a public
sense of the need for drainage prior to the filing of
this application is indicated by the fact that in April,
1927, at the Grosse Ile township meeting the follow-
ing resolution was passed:

"Whereas, the township of Grosse Ile has no defi-
nite plans for the proper drainage of the island, it is
of vital importance that a study be made for the
proper laying out and platting of the future drains
and sewer system of the island.

"Therefore, be it resolved by the electors, tax-
payers and citizens of the township now assembled

at this annual meeting that the township board be instructed and empowered to take such steps as they deem necessary to have formulated a definite plan for the future drains and sewer system of this township.

"It was moved and supported that the sum of $250 be voted by this meeting to be used to defray cost of such a preliminary study or survey."

And the minutes of an earlier meeting of the township board, August 20, 1926, disclose the following:

"And due to report made to the township board relative to poor drainage conditions on Bellevue avenue, it is the sense of the board that Bellevue is badly in need of a new drain. The supervisor explained that three different plans could be used, a drain commissioner's plan, a county plan and a township plan for construction. * * * Carried."

As noted above in December, 1927, the statutory number of landowners made application for the laying out and designating a drainage district for the proposed Grosse Ile tile drain No. 4. Thereafter a petition dated June 16, 1928, was addressed to the county drain commissioner asking that this drain and its laterals be located and constructed. Among the signers of this petition the names of 11 of the plaintiffs appear. No question is raised about the regularity of the proceedings which led to the construction of the Grosse Ile tile drain No. 4. It was completed at a cost of $85,329.61; and a court order was secured which permitted the issuance of drain bonds in the amount of $85,000. Assessments were regularly levied for the costs of this drain. These assessments extended over a period of years. Some of the plaintiffs have paid part of the assessments; other installments are past due and unpaid. The work was initiated and completed under Act No. 316,

Pub. Acts 1923, as amended by Act No. 365, Pub. Acts 1925.*

In stressing their contention that this structure is a sanitary sewer rather than a drain, appellees point out the uncontroverted fact that the raw sewage from the improved properties along the line of the drain, including those that formerly used the Smedley sanitary sewer, is discharged into this drain; and they also stress that as a part of this structure provision was made for a septic tank or settling tank. But in this connection it must be borne in mind that even prior to Act No. 318, Pub. Acts 1929 (which authorized the laying of sewers as well as drains by county drain commissioners), there was a provision in the statute from which it conclusively appears the legislature contemplated drains might be constructed for the purpose and with the intent that they should also serve as a means of disposing of ordinary sewage. In part the statute reads:

"Any county drain may be used for sewage disposal by any city, village or township for which it shall be available. * * * Disposal plants, filtration beds and other mechanical devices as will properly purify the flow of any drain may be constructed and become a part of any established drain, the cost of construction therefor to be paid for in the same manner as other drainage costs as in this act provided. Such plants, beds or devices may be described in the petition for the location, establishment and construction of drains, * * * or in the application for the laying out of a drainage district. Petitions for the construction of such plants, beds and devices for use on any established drain may be filed by the same persons and shall be received and all proceedings

---

* See 1 Comp. Laws 1929, § 4838 *et seq.* (Stat. Ann. § 11.1 *et seq.*)—REPORTER.

had thereon in the same manner as other petitions for any drainage construction under this act.'' 1 Comp. Laws 1929, § 4974; being Act No. 316, chap. 17, § 5, Pub. Acts 1923, as amended by Act No. 365, Pub. Acts 1925.

The record on this appeal discloses that the petition for locating and constructing this drain specified and provided for ''a special diversion chamber and septic tank.'' Hence it appears the petitioners, a number of whom are plaintiffs herein, and all others connected with the construction of this drain knew from the outset that incidental to its drainage the area would be provided with an outlet for its sewage. In other words, there was contemplated the construction of a drain capable of carrying off sewage. As noted, such a construction was permissible within the law at the time the petition for this drain was filed. That such a construction was contemplated is sustained by the testimony of the drain commissioner to whom the petition was addressed and under whose supervision the improvement was completed. We quote from his testimony:

''Q. Were you building this structure there to take their sewage, or to take their surface water; which?

''A. It was to take the surface water, the storm water, and the subsurface water, and, incidentally, the sanitary.

''Q. Now, what was the primary purpose? * * *

''A. That is built there, the size of it is built to take care of storm water.

''Q. That is, the size of it was determined by the storm water flow?

''A. Yes, sir.

''Q. And what other purpose was it built for, in your opinion, as an engineer?

''A. Well, to take off the subsurface water and domestic waste. * * *

"*Q.* You think this structure was also contemplated to drain the cellars?

"*A.* Surely.

"*Q.* Would you say, in your opinion as an engineer, that the size of the filtration basin and septic tank would indicate that the disposal of sewage was incidental to the structure as a whole?

"*A.* Yes."

"If a drain of this size and character was necessary in the judgment of the commissioner for the adequate drainage of the district, and was designed and constructed for that purpose, it matters not that it is capable of being used as a sewer." *Hankinson v. Deake,* 265 Mich. 1.

That this structure is in fact effectively used as a means of underground drainage for this district is indicated by the following testimony given by one of plaintiffs' witnesses who all his life had lived on Grosse Ile and at the time was highway commissioner.

"When they dug this sewer through, they took the clay and dirt out of that and filled up ditch No. 1 (which crossed Bellevue avenue) for, I should judge, 500 feet south.

"*The Court:* What happened north?

"*A.* Well, they took and run that ditch down into the big sewer. * * *

"*Q.* Now, referring to ditch No. 2 on Exhibit 1, where did that ditch start before the sewer was built, up to the north?

"*A.* Macomb street, half a mile from Bellevue. * * * When they built the parkway there they put a big oil pipe under the (rail) road to carry that water from Macomb street down through under it and then into the swale down into the drain. * * * There is also a ditch on the south side of Macomb street that comes west and turns into this ditch. * * * The water north of Macomb street goes into No. 2 ditch from almost a half mile north of Macomb

street. Ditch No. 3 went to Macomb street and water goes up Macomb street, west and south and then comes through Bellevue or did go through Bellevue, but they stopped it at Bellevue.''

As noted above, provision was made in the construction of the instant drain for taking care of the surface flowage from these ditches which evidently extended over a large area.

As is stressed by appellees, the inference might be drawn from the construction of this drain that it is in fact a sanitary sewer. Such was the finding of the trial judge. But careful consideration of this record as a whole leads to the conclusion that all parties in bringing about the installation of this structure were concerned with the matter of drainage. It is a well known fact that as land is developed for residential purposes, streets of an improved character are a necessity and these cannot be preserved except special drainage is provided to care for surface water. It is equally well known that not infrequently this type of drainage is cared for by structures of an entirely different character than drains used to improve agricultural lands. Not infrequently drains designed to carry off volumes of surface water incidental to storms and melting snow are constructed with closed joints and laid deep in the ground, as in the instant case. This, however, does not deprive the structure of its character as a drain.

If the character of the structure involved in the instant suit, as to its being a drain or a sewer, were a close question, surely it would not be the duty of the court to be too prone to adopt the latter conclusion since those who petitioned for this improvement got exactly what they sought; and neither they nor those who as grantees may stand in privity with them are assuming a position which appeals strongly to equity. They not only obtained the improvement

for which they petitioned and for the cost of which their lands were assessed, but they are continuing to use this improvement and their property values are obviously enhanced thereby.

Our quotation from the opinion of the trial judge in *Kennedy* v. *Dingman,* 272 Mich. 24, can well be applied to the instant case. We said:

"It must be apparent then, that this project partakes of some of the characteristics of both a sewer and a drain, and that the line of demarcation which would stamp it unmistakably as one or the other is difficult to discern. The court is firmly convinced that hair-splitting distinctions should not be resorted to as a means for invalidating a project in which large sums of public money have been expended and which adequately serves an admitted public purpose."

Our review of this record leads to the conclusion that in its inception this structure was contemplated as a drain, that there was real need of drainage in the district, and that the structure effectively provided the needed drainage. At that time there was authority in law for the construction of such a drain by the county drain commissioner notwithstanding that it was also contemplated it would be used incidentally in carrying off sanitary sewage. The instant case falls within our decisions in *Hankinson* v. *Deake, supra; Kennedy* v. *Dingman, supra;* and *Hoad* v. *Van Wagoner,* 278 Mich. 600. From our conclusion it follows that plaintiffs are not entitled to relief.

The decree entered in the circuit court is reversed, and one will be entered in this court in accordance herewith. Appellants will have costs of both courts.

Butzel, C. J., and Wiest, Sharpe, Potter, Chandler, and McAllister, JJ., concurred. Bushnell, J., did not sit.