ROYAL OAK DRAIN DIST., OAKLAND COUNTY, MICH., et al. v. KEEFE et al.

No. 7280.

Circuit Court of Appeals, Sixth Circuit.

Jan. 14, 1937.

788

Donald C. Porritt, of Pontiac, Mich., and W. C. Hudson, of Royal Oak, Mich. (Sherman McDonald, of Royal Oak, Mich., Orph C. Holmes, of Ferndale, Mich., Percy G. Horler, and Arthur E. Moore, both of Royal Oak, Mich., on the brief), for appellants.

Irvin Long, of Detroit, Mich., and D. M. Wood, of New York City (Dykema, Jones & Wheat, Goodenough, Voorhies, Long & Ryan, all of Detroit, Mich., and Thomson, Wood & Hoffman, of New York City, on the brief), for appellees.

Before SIMONS and ALLEN, Circuit Judges, and RAYMOND, District Judge.

SIMONS, Circuit Judge.

In a class suit brought on behalf of the holders of bonds of a drain district to determine validity and force payment of bonds in default, the appeal is from a decree granting the relief sought. The plaintiffs are transferees of bonds under an agreement purporting to create an express trust. The defendants are the Royal Oak Drain District in Oakland County, Mich., the county itself, and its treasurer, clerk, drain commissioner, board of auditors, and board of supervisors, the city and township of Royal Oak, and the cities of Berkeley, Ferndale, and Pleasant Ridge in Oakland county.

Proceedings for the building of the "Royal Oak Drain," so called, were begun in 1925 and a drain district established by the County Drain Commissioner under provisions of Act No. 365 of the Public Acts of Michigan of 1925. Bonds issued in denomination of $1,000 each, and aggregating $3,775,000, were sold, some to the predecessors in title of the present plaintiffs and the rest to other persons on whose behalf the suit was brought. Interest and principal of the bonds were paid as they became due up to and including May 1, 1931, after which there was default. The suit is defended on the ground that the drain commissioner failed to acquire jurisdiction because the proj-

ect was for the construction of a sewer and not a drain, and so not authorized by the statute under which proceedings were brought; that the proceedings did not comply with statutory requirements; that the plaintiffs are not bona fide holders of the bonds, so that as to them the defendants are not estopped by any recitals therein to question validity; that the bonds were not negotiable; that the deposit agreement solicited by plaintiffs is tainted with champerty; that the general funds of Oakland county are not chargeable with any deficiencies in the drain fund; that the decree is so ambiguous and uncertain in its terms as to make compliance impossible; that in any event the plaintiffs have a complete and adequate remedy at law.

■ We deal first with the status of the plaintiffs in respect to their right to sue in the federal court on behalf of the class for whose benefit the action was brought. They are all residents and citizens of states other than Michigan. The defendants are municipal corporations, legislative entities, or individual citizens of Michigan, and no question is raised as to the amount in controversy. Equity Rule 38, 28 U.S.C.A. following section 723 provides that: "When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole."

It is affirmatively shown, and the master and court so found, that each of at least two subsequent purchasers bought certain of the bonds here involved in the principal amount of more than $3,000 par value before maturity without notice of any defense thereto, and thereafter, while residents of states other than Michigan and prior to the commencement of this suit, assigned such bonds to the plaintiffs as members of a bondholders' protective committee in trust for the purposes recited in the deposit agreement. The creation of this committee was prompted by the fact that about five years after the issuance of the bonds the Michigan Supreme Court declared certain taxes assessed in other drainage proceedings invalid on the ground that the project to which they related constituted a sewer and not a drain, whereupon the taxpayers in the district here involved refused to pay their assessments and the local authorities refrained from collecting them.

The deposit agreement entered into by the plaintiffs with the holders of bonds recited the difficulties that had arisen, the advantages of a "union of interests" and "concerted action" among bondholders, and provided: "Each depositor does hereby assign and transfer to the committee the bonds and coupons deposited hereunder by him, and agrees that the members of the committee, by such deposit shall be vested under the terms hereof, as trustees of an express trust with the legal title to all the bonds and coupons deposited hereunder with all the rights and powers of owners thereof." The agreement authorized the committee to take any action, proceeding, suit, or remedy, to enforce the payment of the bonds, enter into any agreement of settlement, purchase, or redeem land sold at tax sales, compromise with landowners, buy, hold and improve redeemed or purchased lands, organize a corporation to take title thereto, and generally to exercise in respect to the deposited bonds all powers, privileges, and rights necessary, incidental, or proper to the general purposes of the deposit agreement. We think it clear under the rule of Bullard v. City of Cisco, 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254, 93 A.L.R. 141, that the plaintiffs are the owners under a definite and valid express trust of the bonds assigned to them under the deposit agreement; that their right to sue in the federal court to collect the bonds and coupons depends upon their own citizenship and the amount they sue for, which is in excess of $3,000, and not upon the citizenship of the transferors and the amounts of their individual interests. Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673.

■ In this connection it is also necessary to dispose of the charge that the deposit agreement is champertous. The defense of champerty does not exist in the state of Michigan except as it relates to contracts entered into for litigation and solicited by attorneys at law. National Adjusting Ass'n v. Dallavo, 253 Mich. 239, 234 N.W. 485; Chicago Bank of Commerce v. McPherson, 62 F.(2d) 393 (C.C.A.6). Concurrent findings of master and court establish that there is nothing in the record to indicate that the purpose of the plaintiff committee was to solicit employment for lawyers, and the terms of the contract indicate that its objects are not other than that of the union of interests and concerted action by and for the mu-

tual benefit of bondholders therein recited. The defense of champerty must be rejected.

■■■ Likewise must be rejected the contention that the defendant drain district is not an entity capable of being sued as obligor on the bonds. Section 15a, article 8, of the Michigan Constitution, in force at the time the bonds were issued, provides: "Any drainage district, established under provision of law, may issue bonds for drainage purposes within such district." The drain law provides that bonds issued thereunder shall be signed by the drain commissioner on behalf of the drainage district. It is a principle of universal application that a bond implies an obligor bound to do what it is agreed shall be done. Davenport v. Dodge County, 105 U.S. 237, 26 L.Ed. 1018; Equitable Surety Co. v. Board of Commissioners, 256 F. 773 (C.C.A.5). Cf. Roberts v. Richland Irrigation District, 289 U.S. 71, 53 S.Ct. 519, 77 L.Ed. 1038; Aylesworth v. Gratiot County, 43 F. 350 (C.C.Mich.), affirmed 159 U.S. 250, 15 S.Ct. 1039, 40 L.Ed. 146.

The principal defense, however, is that the proceedings in connection with the construction for the payment of which the bonds were issued were defective and void, and that the bonds are therefore invalid, permitting no recovery thereon. There are in our view two aspects to this defense. First it is urged that the proceedings were irregular, in that the documents filed therein did not describe with sufficient particularity some of the affected land, and were not signed by a sufficient number of qualified persons, and that some of the lands were not benefited to the extent that they were assessed for drain taxes. The irregularities charged are, of course, in implied recognition of proceedings under the drain law. More fundamental, however, is the attack upon the jurisdiction ab initio of the drain commissioner to lay out the drainage district, issue bonds, or undertake construction under the drain law, because it is urged that the project was not a drain at all, but in reality a city sewer, or at best a combined sewer and drain, for the construction of which no authority exists under the statute, so that the bonds are therefore void.

■■■ In so far as the argument is based upon the provisions of the drain law, and failure to comply therewith, we think it is clear that defendants are estopped by the recitals in the bonds, and barred by the provisions of the statute itself from relying upon the defense. Each of the bonds recites that it is one of a series issued under the authority of and in full compliance with the provisions of Act No. 365 of the Public Acts of Michigan 1925, and that: "It is hereby certified and recited that all acts, conditions and things required to be done, precedent to and in the issuance of this bond, in order to make it a binding obligation of the Royal Oak Drain District, have been done, have happened, and have been performed in due form and time as required by law, and for the prompt payment thereof and of the interest hereon the full faith, credit and resources of said Drain District are hereby irrevocably pledged."

■■■ The well-settled rule is that, when public officers having the legal power under certain conditions and for a certain purpose to issue bonds have actually issued such bonds, and the latter recite that they are issued under the conditions and procedure provided for such purpose, bona fide purchasers thereof are entitled to rely on the truth of such recitals and to invoke the doctrine of estoppel against any defense inconsistent with such truth. Evansville v. Dennett, 161 U.S. 434, 443, 16 S.Ct. 613, 40 L.Ed. 760; Waite v. Santa Cruz, 184 U.S. 302, 22 S.Ct. 327, 46 L.Ed. 552. As was said by this court in City of Defiance v. Schmidt, 123 F. 1, 5, 6: "A general recital that all the things required by law to be done have been done, is ample to estop a city from setting up any lack of regularity in issuing the bonds, whether by failure to comply with conditions precedent or otherwise. If an examination of the law shows the power exists, no investigation of the record to ascertain whether the conditions precedent to its exercise have been complied with is required in the face of such a recital." It is unnecessary to multiply citations.

■■■ Moreover, the claim of irregularity in the proceedings under the drain law is, we think, foreclosed by the statute itself. The applicable act is No. 316 of the Public Acts of 1923, as amended by Act No. 365 of the Public Acts of 1925. Section 11, chapter 6, thereof contains the following provision: "The proceedings in establishing any drains shall be subject to review upon certiorari, as herein provided. * * * If no certiorari be brought within the time herein prescribed, the drain shall be deemed to have been legally estab-

lished, and its legality shall not thereafter be questioned in any suit at law or equity." In findings approved by the court and not challenged, it is established that no proceedings by certiorari or otherwise were ever taken by any one to question the legality or regularity of the proceedings under the Michigan statute. The result therein indicated must follow.

The contention, however, that is now most earnestly urged upon us is based, not upon the irregularity of the proceedings under the drain law, but upon the total lack of power on the part of the drain commissioner under the statutes of Michigan to build anything but a drain. The argument is pressed that the structure for the payment of which the bonds were issued was a sewer and not a drain, and so not under the jurisdiction of the drain commissioner under Michigan law. His acts are said to have been mere usurpations, and it is urged he was without power to issue bonds or create any legal liability whatsoever in the undertaking. If the premise is sound, the argument is persuasive and based upon unimpeachable authority. Anthony v. County of Jasper, 101 U.S. 693, 697, 25 L.Ed. 1005; German Savings Bank v. County of Franklin, 128 U.S. 526, 9 S.Ct. 159, 32 L.Ed. 519, and many other cases. This necessitates excursion into the history of the Royal Oak drain and examination of the Michigan authorities dealing with the scope of the drain law.

The territory incorporated into the Royal Oak drain district lies in the southeastern part of Oakland County and includes a considerable part of Royal Oak township and portions of Southfield, Bloomfield, and Troy townships. Originally it was rural in character, and was drained by a series of county ditches, chief of which were the Allen drain and the Hubbard drain. These sufficed for the adequate drainage of the farms in the area, though there were occasional spots where water stood during wet periods, and in the extreme southwest there was a tract of more or less indefinite limits commonly known as the Hubbard marsh, which was swampy in character. As the territory grew more urbanized, the ditches were more or less neglected, and in 1924-25 considerable areas between the Hubbard marsh and the Twelve Mile road had become marshy and water-logged. This was not true, however, in the northern and eastern parts of the district, in the city of Berkeley, the city of Royal Oak,

and on the sand ridges and other higher parts. Being just north of Detroit, rapid urban development of the section took place from 1911 to 1927, and there grew up the cities of Royal Oak, Ferndale, Berkeley, Pleasant Ridge, and Huntington Woods, and the villages of Oak Park and Clawson. Much of the property was subdivided and improved, and sewers and water mains were in many places being installed, with the result that a considerable demand arose for relief in the way of both sewage and drainage facilities.

The original application for laying out and designating the drainage district was made on the 31st day of January, 1925. The district consisted of approximately 13,000 acres, and the project called for the construction of some 27 miles of underground facilities consisting of reinforced concrete, concrete pipe, brick, and vitrified pipe varying in diameter from 15″ to 15′. There were four main branches which converged into the main trunk, which emptied into an open drain known as the Campbell road and Red Run improvement drain. The average depth of construction of the entire drain is 18 feet, with a maximum depth of 45 feet. Some of it is constructed in public highways in platted property, and at a depth sufficient to allow basement drainage from adjacent buildings, and it serves as an outlet for some of the sewage from the cities and villages along its course. The total computed cost of the drain was over $4,000,000, and bonds were authorized and sold to the extent of $3,775,000.

There can be little doubt from the evidence, however, that the engineers who were employed designed a structure that was primarily a drain in purpose, and that much of the impetus to the project was the marshy condition of a large part of the district to be served and the inadequacy of the county ditches which were to be supplanted to take care of the surface waters of the area. While it was anticipated that there would be some sewage through the drain, because county drains were always used in populated areas for the discharge of a certain amount of sewage, the supplanted Allen and the Hubbard drains having been so used, and the statute (section 5, chapter 17 of the Drain Act, as amended) permitting such use, the primary purpose of the enterprise was undoubtedly the construction of a drain and not a sewer. The proceedings by which the project was initiated and carried to a con-

clusion were not challenged until 1932. In the meantime, up to May 1, 1931, accruing interest and maturing principal had been paid when due, and fifty-nine bonds had been paid in advance of maturity. The redemption fund on deposit with the Pontiac Commercial Savings Bank on the last-named date was over $236,000, and there has been collected subsequent thereto and diverted by the county to other purposes more than $170,000 additional.

Doubt as to the legality of the proceedings was first entertained after the Michigan Supreme Court on March 7, 1930, in Clinton v. Spencer, 250 Mich. 135, 229 N. W. 609, invalidated assessments and enjoined the collection of taxes for the construction of the Southfield drain. This was a large underground sewer entirely independent of any other drainage project, and its construction was held not authorized by the drain law. There followed Kinner v. Spencer, 257 Mich. 142, 143, 241 N.W. 240, a decision to the same effect in respect to assessments for the identical project. Meanwhile, in Township of Lake v. Millar, 257 Mich. 135, 241 N.W. 237, the court enjoined assessment and collection of taxes for a project in Macomb county for the maintenance of a drain disposal plant, filtration beds, and purification plant, which clearly marked the enterprise there as a sewer. Aside from text-book definitions of doubtful value, expert evidence sharply controverted and authorities dealing with statutes of other states in relation to dissimilar circumstances, this line of cases is the principal reliance of the defendants.

It will be noted that the Michigan cases cited do not adjudicate the character of the project here in controversy, or the validity of the present or any bonds. Indeed, in Kinner v. Spencer, supra, the court expressly declined to pass upon the validity of the bonds, since none of the holders were parties. It will also be noted that all were decided after the bonds in issue were purchased and after the assailed structure was completed. We pass the question, however, as to whether these cases must control decision here or whether under the doctrine of Kuhn v. Fairmont Coal Co., 215 U.S. 349, 30, S.Ct. 140, 54 L.Ed. 228, they are to be ignored in respect to rights accrued prior to their announcement, for it seems to us clear in the light of later pronouncements of the Michigan Supreme Court, and of the facts as we find them, that Clinton v. Spencer and Kinner v. Spencer, supra, have been misunderstood.

The presumption always is that public officers act in accordance with the law, and this is clearly recognized in Michigan in respect to the very powers here challenged under the statute. Village of Clawson v. Van Wagoner, 268 Mich. 148, 255 N.W. 743. Our inquiry must then be as to whether under the facts of this case and the applicable law the presumption has been overthrown, and we are here concerned not so much with technical definitions or nice distinctions as we are with what under Michigan law constitutes a drain and by what criteria its character as such is to be determined, for it must be clear upon observation and experience that every sewer will carry drain water and that most drains carry sewage. The line distinguishing the one from the other is not to be too finely drawn upon their capacity for use. That the cost, size, and depth of the structure or the material of which it is built likewise furnishes no appropriate test of classification is likewise clear, notwithstanding apparent justification for the application of such tests which a superficial reading of Clinton v. Spencer, supra, might indicate. In Hankinson v. Deake, 265 Mich. 1, 251 N.W. 418, 419, the court rejected such indicia, saying: "The proceedings followed by the Commissioner are authorized by the Drain Law and are not to be invalidated because the drain constructed resembles a sewer or is capable of being used as a sewer." The mere fact that drains have, as have other instrumentalities of public service, evolved from primitive expedients into costly and scientifically fabricated facilities, does not of itself change their legal character or essential purpose. This is indicated by the evolution of the drain law itself, unnecessary as it may be to indicate the steps by which it has been implemented to meet modern requirements. The Michigan court undoubtedly put its finger on the controlling legal distinction between sewers and drains when it held in Kennedy v. Dingman, 272 Mich. 24, 261 N.W. 123, 125, that the primary purpose of the structure determines its character under the law, regardless of what may be purely incidental purposes. "The main and primary purpose was the construction of a drain and not a sewer, although in a few instances the latter use might become incidental. Had the main purpose been that

of a sewer, and drainage been incidental, a different question would be presented." Finally, it is of utmost importance here that the court gave unanimous approval in the last-cited case to reasoning of the trial judge, peculiarly applicable to present circumstances:

"It must be apparent then, that this project partakes of some of the characteristics of both a sewer and a drain, and that the line of demarcation which would stamp it unmistakably as one or the other is difficult to discern. * * * The security of the bonds as public obligations should not be so lightly jeopardized. If the prospective purchaser of drain bonds must resort to almost imperceptible niceties of distinction and must make a microscopic examination of all the engineering factors involved in a proposed public project before he may safely invest his capital, at the risk of losing his investment if his conclusion is wrong, the financing of public improvements of this nature will be most hazardous. Admitting, as we must, that the constitutional limitations upon the authority of public officers must be scrupulously preserved and that ultra vires acts should in no case be condoned by judicial approbation, it seems clear that courts should not resort to specious reasoning, nor superfine differentiations in order to nullify the acts of public officers who have acted in good faith and in the belief that they were exercising lawful powers, especially when, as in this case, there is substantial ground for confirming their belief."

The master below made no finding as to the essential character of the project here involved nor as to its primary purpose in the view that questions both as to the regularity of the proceedings and the jurisdiction of the commissioner were foreclosed upon the principle of estoppel. We find, however, upon the record, that the primary purpose of the structure here in controversy was that of a drain, that the commissioner in good faith acted under the drain law, and in any event that the presumption that he had power so to do has not been overthrown. Further than that we are not required to go. We are fortified in this conclusion by the circumstance that the bonds were permitted to be sold, construction to proceed, the project to be completed, and maturing interest and principal upon bonds to be promptly met for almost six years without either

protest or contest so far as this record discloses on the part of taxpayers or the local authorities. Acquiescence does not, of course, confer power, but it may nevertheless, even in a doubtful case, point persuasively to its existence.

The bonds here involved are payable out of installments of drain taxes assessed against the lands in the drainage district and against certain cities and townships. We are therefore met with the contention that the instruments are not negotiable and that the plaintiffs not entitled to the status of good faith holders for value in whose behalf the estoppel of their recitals must operate. But when the term "bonds" is used in a statute it must be deemed to permit negotiable bonds. City of Cadillac v. Woonsocket Inst. for Savings, 58 F. 935 (C.C.A.6). While negotiability turns upon Michigan law, Burns Mortgage Co. v. Fried, 292 U.S. 487, 54 S. Ct. 813, 78 L.Ed. 1380, 92 A.L.R. 1193, no Michigan decision has been cited which casts doubt upon their negotiability. It has, however, persuasively been held elsewhere that negotiability is not destroyed, if all revenues of a district are pledged, by a recited condition that funds for payment must come from a single source. Duval Cattle Co. v. Hemphill, 41 F.(2d) 433 (C.C.A.5). We doubt, however, that reliance upon estoppel created by recitals is limited to those found in a negotiable instrument. Mercer County v. Eyer, 1 F. (2d) 609 (C.C.A.6), affirming Eyer & Co. v. Mercer County, 292 F. 292 (D.C.Ky.); Independent School District v. Rew, 111 F. 1, 5, 55 L.R.A. 364 (C.C.A.8). Moreover, the plaintiffs are entitled to the benefit of a presumption that they are good faith holders of bonds. Mercer County v. Eyer, supra.

The decree herein operates against the county of Oakland, and county officers, who are ordered and directed to cause special assessments and installments of drain taxes to be levied and collected in the manner provided by law for the purpose of paying the plaintiffs and other holders of bonds and coupons which were due at the date thereof, and, in the event that the drain district fund is insufficient for such purpose, it directs that whatever amount may be necessary shall be advanced and paid by the county out of its general fund (which is to be reimbursed out of drain taxes thereafter collected), whenever such advancement by the coun-

ty shall not cause its total debt to exceed the constitutional limitation applicable thereto. There is sharp challenge by the county to the liability imposed upon it on the ground that the court was wholly without authority for such imposition; that under the drain law taxes may be assessed only upon the basis of local benefits, and are not a charge upon the county at large. It must be said here that, at the time the improvement was made and the bonds sold, no statutory provision existed for advancement by the county to make up deficiencies in drain funds. No contractual obligation therefore arose between the county and the plaintiffs. Township of Clearwater v. Board of Supervisors of Kalkaska County, 187 Mich. 516, 521, 153 N.W. 824. ·

■ The Michigan Legislature, however, after the present bonds were issued, amended section 15 of chapter 10 of the Drain Law by Act No. 331 of the Public Acts of 1927, so as to include the following provision: "In case the amount available in the drain fund shall be insufficient to pay the principal or interest of any such bonds heretofore or hereafter issued when they become due the same shall be advanced and paid by the county out of its general funds and reimbursement to said general fund shall be made out of the drain taxes thereafter collected, provided that such advancement by the county shall not cause the total debt of the county to exceed the constitutional limitation thereof."

This amendment, in Regents of the University of Michigan v. Pray, 264 Mich. 693, 251 N.W. 348, was held constitutional and retroactively applicable to drainage bonds issued and sold prior to its enactment. While this statute was nonexistent at the time contractual rights were created by the issue and sale of bonds, and while it created no contractual rights constitutionally immune from impairment by the Legislature, it imposed a duty upon the county which by appropriate proceedings may be enforced, Moore v. Harrison, 224 Mich. 512, 195 N.W. 306; Whitman v. Township of Royal Oak, 269 Mich. 146, 256 N.W. 835, and as hereinafter noted the decree below was entered while the 1927 Act was in effect.

■ In 1935, approximately six months after final decree was entered below, the Legislature passed Act No. 238 of the Public Acts of 1935, which again amended section 15 of chapter 10 of the Drain Law, striking from it, however, the provision for the advancement of funds by the county as provided in the 1927 amendment. It contains this saving clause: "Provided, however, That this amendatory act shall not be considered to affect any bonds or refunding bonds issued prior to the effective date hereof and subsequent to the effective date of Act number three hundred thirty-one, Public Acts of nineteen hundred twenty-seven, or any refunding bonds hereafter issued to replace the same."

Since the present bonds, though issued prior to the effective date of the 1935 act, were not issued subsequent to the effective date of the 1927 act, it is contended that the liability imposed .upon the county by the 1927 act was not preserved, since such bonds were deliberately excluded from the saving clause, so that the 1935 act operates to retroactively repeal the provisions of the 1927 act which imposed a liability upon the county. We do not so construe it. Clearly the saving clause of the 1935 act was in recognition of lack of constitutional power on the part of the Legislature to impair contractual obligations in respect to bonds issued while the 1927 act was in effect. Moreover, there is nothing otherwise in the 1935 act to indicate intention that it be retroactive, and it is a familiar rule of statutory construction that no. law will be given retroactive effect unless in it is to be found a declaration of retroactivity "clear, strong, and imperative." United States v. Heth, 3 Cranch, 399, 413, 2 L.Ed. 479; United States v. Burr, 159 U.S. 78, 15 S.Ct. 1002, 40 L.Ed. 82; Shwab v. Doyle, 258 U.S.· 529, 42 S.Ct. 391, 66 L. Ed. 747, 26 A.L.R. 1454; O'Shaugnessy v. Commissioner, 60 F.(2d) 235 (C.C.A.6), a rule incorporated into Michigan statute law by the express terms of Act No. 25 of the Public Acts of 1931.

■ The remaining contentions of the appellants require little discussion. Their concern over the provisions of the decree requiring contribution to the expense of prosecuting the suit by nondepositing bondholders is best answered in the language of Mr. Justice Cardozo: "Petitioners are not the champions of any rights except their own." Ashton v. Cameron County Water Imp. District, 298 U. S. 513, 540, 56 S.Ct. 892, 900, 80 L.Ed. 1309. Complaint is also made both as to the vagueness and as to the harshness of

the decree, it being urged that the manner of compliance is not too clearly indicated and would exhaust all of the ordinary revenues of the county, leaving nothing for the ordinary expenses of government. The case was tried three years ago. Neither as to exigencies then existing nor those since arising are we so advised that we may evaluate the grievance. The court below retained jurisdiction for the purpose of carrying the decree into effect, and for the purpose of granting such further relief as should thereafter be deemed necessary. Until there has been good faith effort to comply with the decree, the appropriateness of the mechanics provided to secure the relief adjudged may not be determined. The cause is to be remanded to the District Court, and we assume that petitions for the clarification or amelioration of the decree may still be addressed to the sound discretion of the court if need is demonstrated.

The decree below is affirmed.